Forina v. Nokia, Mr. Jacobs. Good morning. Good morning. Kenneth Jacobson on behalf of Appellant Francis J. Forina, and I'd like to request three minutes rebuttal with the Court's permission. You have it. There are many fascinating jurisdictional issues in this case involving CAFA and commencement of an action and relation back, and we could probably spend three hours of argument just on those, and you may want to touch it. But at least for me, I'm most interested in going to the end of the case and hearing what you have to say about conflict preemption and the fact that the initial action was taken under NEPA and then the subsequent action under the TCA and then into the issues as to whether or not there is conflict preemption and how Wyeth affects it and so forth. I will do that. Thank you, Your Honor. Your Honor, this is, as Your Honors know, this is a consumer class action for breach of, under State court, under only State court, Pennsylvania State court, for breach of warranty with respect to and arising out of the defendant's voluntary and unregulated warranties and statements about the safety of their cell phones that appeared in advertising, promotional literature, and in other documents that they used to market their phones. No State or Federal rule either permitted or prevented these defendants from making the statements that they did. But having chosen to voluntarily speak, having chosen to issue warranties, there was a responsibility not to deceive the public and to tell the truth in their statements, in their warranties about the adverse biological effects of the emissions from these cell phones, as well as the fact that headsets could mitigate these risks. If we start with preemption, I, speaking only for myself, would concede that there isn't any express preemption, but there's a darn good argument that there is implied preemption. Would you want to address that first, then? Sure. Your Honor, in enacting the 1996 amendments, the Telecommunications Act of 1996, there was a specific provision that Congress passed as part of that amendment, Section 601C, that specifically held that there should be no implied preemptive effect from any of the amendments that were passed. It was pursuant to those amendments that the FCC promulgated the RF emissions that the FCC did. It almost sounds as if what you're challenging is the validity and sufficiency of those particular RF radiation standards. Not at all, Your Honor. We're not challenging, we're not seeking a lower guideline, and they are guidelines. That's what the label the FCC puts on them. They are guidelines. We're not seeking to lower them. We're not seeking to alter them. What we envision, Your Honor, is litigation similar to what the Wyeth case held, and that was if the defendants want to submit evidence at trial in the lower court, whether that's federal court or state court, that there was compliance with these RF emissions that the FCC had set these guidelines for, they're free to do that. That's exactly what the defendants. In one sense, what Wyeth did and what ultimately happened in our court as a result of that in Colachico, is that you had there the FDA, after about 75 years, coming in simply in a preamble to a regulation saying that we now think we're going to preempt the field, where seven years earlier they had specifically made note that they weren't preempting the field. This case is remarkably different. This is a case where the FCC is not only now fouling a brief, but they've taken the position for a long period of time that this is their bailiwick. This is their turf. They have the ability to make regulations here. They realize that there's not enough scientific evidence. They do rely on others, but they have actively looked at this and, in fact, have engaged in some rulemaking activity. May I disagree with the Court, Your Honor? You can disagree with anything you want. With respect to, or at least if not disagree, may I at least respond to the comment about the FCC? The first point being that this case is very different than what was in Wyeth. Your Honor, I think there are more parallels consistent with Wyeth than differences. For example, Wyeth recognized that the fact of long-term regulation of an industry, of a business by the federal government, does not per se mean that there's preemption. Regulation does not equate to preemption, and Wyeth made that very clear, Your Honor. With respect to the position of the FCC, the position of the FCC, and we are not quarreling with the FCC's ability and right to pass on such technical things as a spectrum The point in Wyeth is, look, you surely have federal regulation, but can you have complementary state regulation? Here, the question is, who has the right to, or what has the government done? The government appears to have done a lot, realizing that it doesn't have all the evidence in with regard to regulation of radiation pertaining to cell phones. Your Honor, with respect to what the FCC has done, the FCC has spoken on preemption. And in Wyeth, the issue was, as Your Honor knows, did the FDA reverse course midstream? Number one, did it do that? Or in that case, reverse course end stream. End stream. And did it do that without notice, without an opportunity to be heard, without any kind of input? Here, you do not have any declaration of preemption except in an amicus brief, which, as we know from the Wyeth case, was discredited by the Supreme Court. Let's deal with conflict preemption rather than express preemption. Well, conflict, Your Honor, conflict preemption is really, and I believe what Judge Dover found, was that there's some kind of obstacle to the development and implementation of the wireless community around the country. It's difficult for us to envision how a headset requirement, which, number one, is already being manufactured and sold by the cell phone companies, and number two, which the FDA and the FCC themselves on their own website advocated as a mitigating measure in case consumers were afraid about the RF effects of headsets, how that would be an obstacle. These companies are already engaged in the business of telecommunication, of wireless telecommunication service. They already provide a headset requirement, which is the requirement that we ask, and the agencies themselves have promulgated the RF standards, advocated the use of headsets. Getting back to the preemption issue and the analogy in parallel to Wyeth, the FCC has not been silent in terms of its lack of preemptive authority. There are more parallels to Wyeth than meet the eye. The FCC, when the FCC, Your Honors, adopted the regulations in 1996 and 1997, and they adopted those regulations in the face of the legislation that was passed by Congress to enable the FCC to preempt the siting of telecommunication towers, it was a zoning decision. Until then, until those amendments by Congress and until the regulations that were issued by the FCC, states and local governments were saying, we're not going to allow a cell phone tower on this parcel. We're not going to allow it on this block. We're not going to allow it by the school. The FCC for decades accepted that kind of regulation by the states and by the local governments, and it was the power that was invested in the FCC and the only limited preemptive power that was invested in the FCC with the 1996 amendments that allowed the FCC now to step in and say, okay, now we have the authority. Now we have the ability to regulate this. The FCC has made affirmative statements that until it received that delegated congressional authority, it lacked any preemptive power at all, and it allowed these facilities to be located and to be zoned and to be dictated to by the state and local governments for decades. So, Your Honor, Judge Ambrose, there was a tolerance and an acceptance of parallel regulation with respect to the states and local governments and the federal government. More importantly, Your Honor, is to look at the preemptive scope of what the Telecommunications Act did and what it didn't do. There's a savings provision in the original 34 Act. What about Section 704B of the TCA? 704B, Your Honor, were the regulations. What had happened was that in 1993, the FCC decided that they might want to change their standards and they implemented a rulemaking procedure that would be applicable to radio frequency facilities. The B of 704 was the component of the A, and that was Congress said, you've got to get your act together, you haven't done anything for three years, we want these regulations issued now, and because we're going to now give you, for the first time, your preemptive authority to stop these schools and local communities from borrowing cell phones. But we're going to do that, but you have to promulgate regulations. That was not a broad grant of authority to preempt local laws, certainly not to preempt warranty laws. One must also appreciate the fact that all of these regulations were adopted under NEPA. They were adopted under, from 1985 through the 1996 regulations, it's recited right in there in the preambles, were adopted under the agency's obligation under that statute to assess the environmental impact of its major activities. There's nothing in either the original Telecommunications Act or subsequent acts. So even if subsection B of 704 relates, talks about emissions, not facilities, you're saying that applies only to cell towers or other forms of transmission? It is, and in fact, 704 itself, Your Honor, the caption of 704 itself is titled, Facilities Siting, and the very first provision, A, is National Wireless Telecommunications Siting Policy. Even Judge Cordova indicated, I think very strongly and correctly, as did the Murray Court, that the Section 332C7 refers to facilities, that the context of it, the interpretation of it, was never intended to apply to cell phones. And when you couple that with the fact that the FCC is routinely declared, it's not a health and safety agency. When the FDA itself, which these defendants argued unsuccessfully down in Louisiana first, the FDA has exclusive preemptory jurisdiction under the Radiation Product Control Act of 1968 to regulate these, then there's, whatever these regulations are, they're not preemptive, and certainly they should not displace the State Court. Linda, put another 10 minutes on, please. The FCC's position is that this is, they have delegated responsibility, and they're doing a lot of the weighing and balancing here, and that permitting these kinds of suits will upset the function that Congress wants them to perform. I understand that's their position, Your Honor. We don't agree with it, and again, we cannot understand how a suit that addresses, that preserves and recognizes the sovereignty of the Commonwealth of Pennsylvania to regulate areas that it has regulated in the past, false advertising, consumer protection, and health and safety, a suit that seeks to take to task the defendants for their affirmative voluntary statements. That's what this case is. This is a case for breach of warranty because the defendants elected to go into the public to sell these phones with assurances and promises of safety, even the FDA and the FCC have said that there is no proof that these phones are absolutely safe. There's no conflict. There's consistency. I understand what the FCC is saying now. As we all know, the FDA and the FCC and other federal agencies have in many cases, including Wyeth and most recently in Cuomo with the OCC where the Supreme Court had to reign in the OCC, have expanded the breadth of their functions and their authority beyond the delegation of Congress. But at the very least, as a result of a congressional order that there be rulemaking in 1996, within a year or within six months after that, and I think in 97, what you had was the FCC coming out with regulations that deal with RF radiation, or standards at least that deal with RF radiation. And they say, look, we're attempting to strike a balance here based on the evidence that we currently have. That looks like the FCC has walked into the arena of regulation pertaining to RF radiation. And we do not dispute that it's not walked into that, and we do not dispute, and nor are we challenging, nor will there be evidence at trial of an attack on their standard. What this case is about is can you make false and misleading statements to the public in advertising material? Because they've waded into the area, Your Honor, does not mean that they've preempted that area, especially in the face of a provision in that same statute, Your Honor. That same statute, Section 601C of the 1996 Act, says there shall be no implied preemption. I don't know how much clearer Congress could be where it says if you're going to promulgate any regulation. No implied preemption of, among other things, federal standards, federal law. And state and local law. And they argue that this is part of federal law. And state and local law, Your Honor. No, I understand. And state and local law. The FCC makes a big point that it's not just state and local, it's federal. We're not trying to, so. But this case, Your Honor, is a state court case. If there's no, I agree with Your Honor, that's what the language says, and I don't understand in this case there being an argument that there's some implied preemption of federal law. But there is no federal cause of action. In fact, Wyeth indicated and recognized that in the absence of a federal remedy, which there is none here, state remedy should be presumed, and a presumption against preemption is even heightened and should be elevated in that situation. Well, even assuming that there is a presumption here in your favor, the district court here relied on Geier, found the claims here to be materially indistinct from those in Geier dealing with failure to provide kind of airbags in particular and restraints. Why was the district court wrong in citing Geier and relying on it? I think the district court was wrong in that the law of preemption has evolved and we now have new guidelines and new standards and new directives from the Supreme Court as well as from the Third Circuit in the Snapple case as well as in the Chicken of the Sea case, which have recognized that the Supreme Court, both in the Altria case as well as more recently in the Wyeth case, has, the Wyeth case could not be more clear, Your Honor, about reaffirming the presumption against preemption, particularly in areas where states have regulated in the past. And advertising and false representations to consumers as well as health and safety, all of which are implicated by this litigation, clearly have been areas that Pennsylvania has. Why shouldn't we look to the Geier case for guidance in making this decision? The Geier case, Your Honor, I think is different in one large respect. There was a direct mandate. There was a direct mandate in that case to the Department of Transportation by Congress to come up with a system to phase in passive restraints. So there was an explicit direct congressional mandate that the Department of Transportation have sole responsibility to decide how and when we were going to phase in airbags. The issue in that case, as Your Honors know, was it was a product liability case, and the allegation was that a car was defective because it wasn't equipped with airbags. We have no comment. So here you've got a clearly a directive from Congress that the FCC is to act with regard to claims about safety or RF radiation. They conduct rulemaking. They come out with standards. And I realize, yes, there is a presumption against preemption, but there's also that takes you so far. And then you have either conflict preemption or field preemption. Why isn't there some type of implied preemption here? When do you cross the line? Okay, there's a presumption against preemption to there is preemption. How would you write an opinion that lays out a standard for us? There's got to be a conflict, Your Honor. And here there is no conflict either legally or in fact. There's no conflict with the ability of the states to provide the remedy we're asking for that conflicts with any policy, any rule, or any regulation of the FCC. I also really need to take us back to what the regulations were that Congress directed the FCC to promulgate in 1996. The FCC had dragged its feet for three years. It had not promulgated new regulations. RF emissions were not regulated at all, not even for towers, not even for broadcast facilities. They were not regulated at all. They were category for cellular services. They were categorically excluded from the 1985 rulemaking process. When the FCC started looking at regulations, RF regulations relating to cellular services including towers, what it did was it didn't do anything for three years. Congress was passing a law now to give it the preemptive authority it needed on zoning issues, on siting issues. And it said we're giving you this authority and you have 180 days to come up with regulations consistent with this authority. That was the delegation of authority that was in Section 704B, Judge Ambrose. With that, as I said before, but it's an important point. I have not seen in my practice, and I do a lot of preempture work, I've never seen an express provision by Congress that affirmatively states that there's no implied preemptive effect to be given to anything that is done under a particular statute. We all know that even if there's an express preemptive provision, that doesn't mean that typical conflict principles can't apply. A lot of statutes have savings clauses. And we have a savings clause here going back to 1934. Your Honor, we have, to make the parallels to Wyeth, we have a savings clause going back to 1934 that says nothing shall preempt, nothing shall conflict with or undermine common law rights or remedies. As in Wyeth, when Congress passed the 1996 amendments, it was very limited in how it In fact, it wasn't a preventive. It was a preservation of state authority except in certain circumstances. The except in certain circumstances, Your Honor, was this zoning and citing of towers and facilities, what they call personal wireless facilities. That was an exception to the rule. The general rule was that all state remedies were going to be preserved. The only time that they excluded, the only exemption The TCA savings clause looks to me like it just deals with base stations. That's right. That's right. There's nothing in it. Your Honor, the TCA, you won't find cell phones at all. And as Judge Padova himself found below, as the Fourth Circuit found in Pinney and as the District of Columbia Court of Appeals found in Murray, there's the idea of trying to put cell phones into the language of 332C7 is really a stretch. But what it does go on to say is that the act, the TCA, the Federal Act, shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided. And it says no, and Section 601C, the caption of that says no implied effect. I mean, it could not be more clear. Is the FCC entitled to Skidmore deference? I don't believe they're entitled to deference at all, Your Honor, in this case. I think that for all of the reasons Isn't Skidmore whatever persuasive effect it might have? To the extent that, and that's what Judge Padova found. That's what Judge Padova found. I don't believe in the evolution of what the FCC did here. But more importantly, the lack of authority, the lack of delegated authority that it's entitled to any deference. If it's entitled to wait to the extent that what I say may persuade you or to the extent what Mr. Frederick said may persuade you, then that's Skidmore deference, and that may apply. Certainly nothing more than that. Not under the standards that Wyeth has set down. We have an identical circumstance. We have a very similar circumstance to what we have in Wyeth. We have an agency coming in, suddenly shifting gears and claiming broad preemptive powers, displacing state laws on the face of an amicus brief, or in that case a preamble to a regulation, done without any notice or without any comment or without any opportunity to be heard, and which was inconsistent. The other thing Wyeth said, which I think applies here as well, Wyeth was very clear. We've been, they pointed out the length of time for the regulation of the FDA and said to Congress, if Congress really wanted to clear the field here and really wanted to engage in broad preemption, Congress knew how to do it. It didn't do it. So the extensive regulation in Wyeth was viewed as a basis not to support preemption. It's your position that your claim here would not affect in any way the strength of the admissions that the RF allows? That's exactly our position, that they're irrelevant. We haven't pled them. We want to go to trial, whether it's before Judge Padova or in state court, on a warranty claim. Thank you, Wyeth. Let me see if there are any other questions. Maybe on rebuttal we'll ask a couple of questions about the CAFA and the relation packets. Very good. Thank you. Good. Thank you very much. Frederick? Good morning. Thank you, Chief Judge. Sirica, and may it please the Court, I'm David Frederick for the appellees. I'd like to start directly with where the conflict is, because I think that the colloquy in my brother's ---- that's being regulated. Is it radio communications, i.e., cell phones, or is it health risks? It's radio frequency. That has long been an instrumentality of interstate commerce. It has long been within the exclusive domain of the federal government, and that radio frequency is exactly what can't be defined by state borders, and that is precisely why the federal government has long had radio frequency and radio frequency effects within the exclusive domain of the federal agencies. That has long been asserted from the Federal Radio Act of 1912 through the 1927 and 1934 acts. The Supreme Court recognized the technical expertise as being clearly exclusive to the federal government in 1963 in the head case, footnote 6 of the Court's opinion there. And where the conflict is here, Your Honor, stems from the nature of the defect asserted under state law. That defect, in order to get a breach of warranty claim, must assert and prove that the products being sold by the appellees are unreasonably dangerous. That is an element of the state law claim, and proof of that element, unreasonable defect through unreasonable safety, brings it into direct collision with the FCC's contrary judgment. But if it's safety, it would seem that maybe the interest at play is a health risk to the user as opposed to just the radio communications frequencies. Not all health risks, Your Honor, come within that notion of traditional state power. As the Supreme Court unanimously found in the United States v. Locke, for instance, the federal government has supremacy over the instrumentality of interstate commerce of the navigable waterways. And even though oil spills might have effects on health and safety of persons using those waterways, the Supreme Court concluded that where there is an area of traditional federal control, as there is with waterways, the presumption against preemption and the notion of historic state police powers does not apply. Does Wyeth undermine Locke? No. No. In fact, Locke being unanimous, I think what the court in Wyeth, with respect to the presumption against preemption, Your Honor, in Wyeth the court addressed a very different statutory regime. When Congress enacted the Food and Drug and Cosmetic Act in 1938, it was aware of state claims that had been made against drug manufacturers. And that parallel state action through historic lawsuits that had been brought against the drug industry had always been thought to be complementary to the federal regime because it raised information coming to light about the dangers of individual drugs that had been approved by the FDA. And it was only when the FDA changed its longstanding regulatory position in the early 2000s that there was a question about whether or not there was a conflict between state tort actions over individual injuries. And here I would like to put a footnote. The plaintiffs here do not assert any injury through radiofrequency emissions. They specifically define the class not to include persons injured. So what, in effect, they're seeking to do through the lawsuit. Or persons not yet injured. Correct. What they are seeking to do through the lawsuit is to question the regulatory judgment that the FCC struck through notice and comment rulemakings that twice have been upheld. First, in the initial action, the Second Circuit upheld them as consistent with the FCC's authority. And then when supposedly new information came to light, a petition was brought to the FCC saying, we don't think you've properly gathered information about the radiofrequency effects. The D.C. Circuit reviewed that and said the FCC was well within its discretion to deny that petition because the evidence wasn't sufficient to justify the FCC reopening a standard that it has now memorialized in notice and comment rulemakings. And the state actions that they assert here run into direct conflict with the FCC's judgment that the standard set, a 50-fold safety standard for radiofrequency emissions, is perfectly safe for use in the interoperable cell phone industry. And that safety standard, I would point out further, directly came from a balancing that Congress directed the FCC to conduct between the rapid deployment in the most efficient means necessary of getting deployment of cell phone services with the safety that would be experienced by the individual user. And that balancing brings this case directly into Geier because there Congress had directed the National Highway Traffic Safety Administration to engage in exactly the same kind of balancing in determining at what point airbags would be mandated versus the passive restraints with seatbelts. And that balancing by being directed to the federal agency was exactly what NHTSA had done there and the court upheld that balancing as being in conflict with. And yet it's a very close question because you've got the Fourth Circuit in an offshoot of this case coming out the opposite way. Let me address that, Judge Ambrose, because I think the Penny court can be distinguished here and it's important, I think, for you to understand how we think the court can best address that. Penny was so focused on the 332C issue, they kind of lost sight of where the real conflict is. And the conflict here comes from the regulations the FCC has promulgated to establish one industry-wide, nationwide standard that all manufacturers must comply with in order to get FCC authorization to sell or lease their products. And by that focus just on one provision of the 1996 Act, the Fourth Circuit really didn't address what the FCC has done through its regulatory actions. You're right in that respect. They also, in addition to talking about 332 at length, they do talk about the savings clauses and how they interpret them. And let me address the savings clauses, Your Honor. First, the 96 Savings Clause only applies to the 96 Act and it does not really act as a normal savings clause. The 96 Act, of course, had very complex provisions that reordered the entire nature of the telecommunications industry, not just in cell phones. And that savings clause really was in effect to keep and preserve existing federal as well as state and local power. The existing federal power here stems from the 1934 Act, which makes very clear that the FCC has the authority to promulgate regulations in the public interest, for the public safety, and for the nationwide distribution and dissemination of radio wave frequencies. So if you look at the ordering clauses of the regulations that are at issue here, Your Honors, the FCC cites specifically to the 1934 Act provisions, those provisions remain federal law under the 96 Savings Clause. Now, if you look at the 1934 Savings Clause, which is in Section 414, that savings clause does not interfere with the clearly exclusive FCC control over the radio waves, as the Supreme Court noted in the head. But what it says is nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies. And in effect, what they're saying is, look, all we're asking is that a, we want a headset requirement as an addition. How does that conflict with federal law? Before a court could order a remedy, a jury would need to conclude that the product being sold is unreasonably dangerous. And it's that conclusion, that element of liability, that brings the case into conflict with the FCC's authoritative judgment. As the Supreme Court in the Bates case. You may be right, but do they really have to make a determination that it's unreasonably dangerous or that there is evidence out there that it could be and that all that we're requiring is a prophylactic measure of a headset being sold, being given out as part of the package in this particular commonwealth? As we've briefed it, and I don't think this has been contested in the briefing, Pennsylvania warranty law requires an unreasonable defect for a breach of warranty claim. And that unreasonable defect must stem from an unreasonable danger that is posed by the selling of the product. And Judge Ambrose, the theory that they advance here has no natural limiting principle. Because what they argue for would lead to the proliferation of state standards. In this case, it's just a headset. One other state may say it needs to be a headset with a particular kind of wire. Another state may say it needs to be a wireless headset. Let's assume for the moment you're right, that they have, under Pennsylvania law, they have to show a defect. But why are they precluded from having the opportunity to prove that at the state level? Because the FCC has determined that a 50-fold safety standard strikes the correct congressionally mandated balance between the rapid nationwide deployment of cell phone services and the putative safety risks that the individual user would use. And I want to point out that the FCC made a distinction between what is known as controlled exposure and uncontrolled exposure. Uncontrolled exposure are those situations where you and I as individual users and consumers may not know that there's any risk of RF frequency at all. And what the FCC did was it set the standard so low that it achieves a standard so that if you have no awareness at all of any exposure risks, you're safe. In controlled circumstances, it set a different standard, and those are the people who work on the cell phone towers and that are exposed to higher levels of RF emissions. And what the FCC was trying to do was to strike the balance between those persons who were not aware of any risk and would be deemed to be safe. Take me back in time a little bit. Wasn't the FCC asked, including by television broadcasters, to make a policy statement which clearly and forcefully asserted the FCC's authority and intention to preempt the field here? And the FCC declined that? In a nutshell, that's more or less correct, Judge Ambrose, but let me emphasize. How does that factor? I'm just trying to figure out how that factors into our analysis. I think it doesn't factor in because it reflects a natural federal agency reluctance ever since President Reagan issued an executive order directing federal agencies not to take a more aggressive and robust preemptive stance than was necessary to accomplish the federal objectives. What the FCC said there was that we don't need to have a complete preemption of everything related, but we're going to evaluate as the case may arise in the future. And certainly the first instance, the Penney decision by the Fourth Circuit, triggered an immediate response by the FCC, which went to the D.C. District of Columbia Superior Court proceedings and filed an amicus brief, which in my experience is a highly unusual act for a federal government agency to do because it wanted to emphasize to the courts that the Penney decision was incorrectly decided. And even after the Wyeth decision was handed down, the FCC filed a letter brief in the Murray Court to say that its opinion about FCC preemption in this circumstance, under this statutory regime, was not altered by the Supreme Court's decision in the non-analogous federal prescription drug context. So I think if you look at the different statutory contexts, the different history of agency action, the absence of a longstanding history of complementary litigation to assist the federal agency in its actions, and the parallel, very close parallel to the Geyer decision where there was a congressionally mandated. But isn't this an area where the FCC is quite candid, admitting that it doesn't have any particular expertise? It has the expertise to determine the balance that Congress mandated for it. And under that balancing, the FCC took into account international and national standard-setting bodies, what the Food and Drug Administration, the Defense Department, a host of federal agencies, and it was the FCC's job. I have no quote. What they did was reasonable. But the question is, this doesn't seem to be an area where it itself has any particular expertise. No, but if there is a need to reopen the FCC's proceedings, the FCC has said if any new evidence comes to light that justifies a reexamination of its regulations, it will reopen those proceedings. There simply hasn't been that kind of information to cause the FCC to change the authoritative balance that it struck. Let's spend a minute or so more on the conflict and what it actually means. As I understand the plaintiffs in this case, they're saying that while there may be a theoretical conflict, it really is not going to affect the FCC's ability to require a particular level of strength of admissions, that it's going to be at best an overlap or an overlay. And while it may incrementally change the standards from state to state, it's not really going to essentially affect what the FCC does, which is to say this is the certain level of admissions. Another ten minutes, please. Am I correct in stating their view? And if I am, what's the response? Well, I think that they are attempting to minimize the conflict to the greatest extent possible because that's their advocacy challenge in this case. But I would point out that paragraph two of the second order by the FCC states that it's balancing, and it was charged with balancing, we believe our decisions provide a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunication services to the public in the most efficient and practical manner possible. Now, under their theory of the case, all 50 states are allowed to introduce new equipment requirements, new equipment standards that impose on industry and the cell phone users and providers requirements that would not achieve the objective. But that's often done. I mean, the classic example is California had higher admission standards with respect to automobiles. That was under a different statutory regime, Your Honor, that allowed for certain exceptions to be made and with the EPA's approval. Here, what the FCC... That would seem to be far, far more complicated for manufacturers than merely adding a headset into the package for a cell phone purchase. Again, to require under state law that the addition of a headset be made, you would first have to determine the liability for an unreasonable defect and unreasonable safety. That's step one. And only if you are able to surmount step one, which is exactly where the direct conflict is, you then are headed right into the proliferation problem that the FCC was attempting to avoid by striking the balance over safety concerns with the widespread telecommunications concerns. And I would point out one more thing about the safety standards, which is that the telecommunications network was designed also to facilitate safety so that a person who wanted to call 911 using his cell phone would have the ready capacity to do that, would not have to worry about interoperability concerns or whether or not he had left his headset at home or whether or not, in the circumstances, the additional equipment requirement imposed by state law would interfere with his ability to use the cell phone for a safety purpose. All of those things came into part of the balancing that the FCC was engaged in here to ensure that there would be a nationwide network that would apply regardless of what state you happen to be in. The, unless there's no further questions, could you just address briefly the CAFA and the relation back argument? Because, I mean, you've got circuits, Ninth Circuit going one way, you've got the Fifth and the Seventh Circuit. If you could talk about relation back for a moment. Well, the Ninth Circuit standard, I think, is one that rested on its interpretation of a state law requirement. So I don't think that if you were to agree with the majority of circuits, you would bring yourselves into conflict on that point. The key thing here is that after CAFA was enacted and became effective... That was 2018-05? That's correct. It was months after that that the second amended complaint was filed that added the LG defendants. That's the dispositive. You think that's the dispositive? Absolutely. Absolutely. Now there is a question as to whether or not you treat the substitution of the proper LG defendant with the improper LG defendants. That's the third amended complaint. Yes, that's correct. And whether or not that affects the removability or remand. But I don't think there's a serious argument here that the request to remand was outside the 30-day period for technical defects. So under the plain language of Section 1447C, that is deemed to be a waivable defect. The subject matter jurisdiction of the district court here is clear under CAFA and the case is properly before this Court. So your point is that if it came into effect on 2018-05, and I guess the matter was stayed on March 22nd, you're still beyond. That's for the second amended. Actually, the second amended complaint came after that. Well, the stay wasn't until 2006, Your Honor. That was March of 2006. Yeah, you're right. And that was after the 30 days had expired for a remand proceeding. Right. Good. You have some more time. I'm happy to take your questions. I've made the points that I came to court to make, and I'm happy to address any questions that you have. We hit you with Wyeth early on. Is there anything else you want to tell us about Wyeth? Because obviously it's a very significant case. Well, I represented Diana Levine in that case, and I believe that this is a very different statutory regime. In Wyeth, the key fact was that the statute had imposed on the manufacturer the duty to keep its label up to date. And through the process of state law tort suits, the manufacturers had information that required them to keep their labels up to date, and there was a federal regulation that explicitly allowed them to change their label without prior federal Food and Drug Administration approval if they got that information. You have a totally different regime here, where you've got the FCC imposing an industry-wide standard that is not attempting to make individual differentiated determinations about products, and you've got thousands of prescription drugs on the market. It's imposing a standard, and it's done it after rulemaking. I concede that. But when it had the opportunity, at the request of others, to say that we are preempting the field, it declined to do that. Why isn't that persuasive evidence that they weren't, at least at that point, attempting to preempt the field? Well, it's actually, I think that that comment really does need to be understood in its context, Your Honor, because even well before, as early as 1979 and 1981, the FCC had said the area of technical standards for radio frequency use is within the exclusive purview of the FCC, and in its Murray brief, it asserts field preemption over those technical standards, which we agree is the appropriate standard to apply. And just because it took a comment by Ameritech and did not deem it necessary to issue a broad-sweeping statement of preemption in 1997 does not negate the actual conflict that arises where state law claims would call into question the FCC's authoritative judgment that the balance it struck was what Congress wanted in measuring safety versus rapid deployment of interoperable cell phone technologies. When was the date of the declination to say that we are preempting the field? That was in the 1997 second order, I believe. So it was roughly the same time that they were doing the standards here, pursuant to rulemaking, correct? It was part of that rulemaking process. That's correct. So is it part of the rulemaking process? We're setting standards, and we are being asked to say that we're preempting the field, and we decline to say that we are preempting the field. Now, maybe it's changed since then, but if it has changed since then, what is the evidence that that's the case from the FCC's point of view, other than the fact that they have filed a brief? I don't think it would have occurred to the FCC, to be perfectly honest, that there would be a state court proceeding that would act in a parallel fashion to second-guess the regulatory judgment of the commission with respect to RF standards. There certainly had been no history of actions in state court for radio frequency, ever. And so the notion that the FCC... Because the state court would not be concerned with that. The state court would be concerned with safety, health. Well... And we've all read that people, you know, you may think it's silly, but you've seen things on the news that say extended cell phone use can cause an issue. Now, and obviously the FCC has begun, through the use of other agencies, to look into it, but why, as a complementary standard, or a... Why can't, on a parallel basis, a state court do the same? Because that challenges the authoritative judgment about how to strike the balance. If the FCC's determination here that manufacturers are selling unreasonably dangerous products that meet the 1.6 watts per kilogram SAR standard, in order to get you to your remedy, that directly conflicts with the FCC's determination of what constitutes a safe standard. And it is that which drives the conflict completely, Your Honor. There may be issues about conduct. Driver conduct, or using a cell phone in a restaurant that, you know, the local agencies are perfectly within their power to implement. But that's different from apparatus or equipment. Apparatus and equipment are what the FCC is charged with regulating, and it has made that regulatory determination here. Any other questions? Mr. Frederick, thank you very much. Thank you. A couple of points, if I may, on rebuttal. Let me, if I just, the point that Mr. Frederick's making is, look, the, if you need under state law an unreasonable defect, and as a result of formal federal rulemaking, the FCC has determined that there is not, at this time, enough evidence to show that there is an unreasonable defect to allow states to come in and to say otherwise is going to create, he hasn't said this, but I'll extrapolate, a hodgepodge of various requirements in various states. You do this in Pennsylvania, then what's California going to do, et cetera, et cetera. And it really defeats the purpose of something that's clearly been deemed, from way back, to be under federal purview. The problem with that argument, Your Honor, is that there is not a requirement of unreasonably dangerous product under warranty law. That is a strict liability, product liability concept. What would you have to prove under PA law? It's a breach of warranty. They said things to the public that were not true. They made promises to the public about safety and about the use of these phones without disclosing the biological effects that these phones cause. The Murray decision addressed that specific issue. But the biological effects would have to, wouldn't they have to be harmful? And yet you're claiming that the persons here are those who are not harmed, right? Well, we're not claiming personal injury, but there are clearly harmful effects. There are clearly adverse health effects that the FCC and the FDA acknowledge that emanate from the use of the cell phones. But don't the adverse effects have to be unreasonable? No, not at all, Your Honor. There are different concepts under tort law, and the Murray decision addressed those. The Murray decision did not allow claims to go forward under strict liability, unreasonably dangerous principles. It did allow claims to go forward under claims like ours, consumer warranty, because false representations and warranty law has a different standard. If you promise something, if you make statements about something, then you have to deliver in those. So the fact is we do not. The defect is not, and we don't have to demonstrate at trial, that these products were unreasonably dangerous, nor do we have to demonstrate that there should be a lesser standard. As I said, I expect the trial in this case to be like Wyeth, where they come in and say, we meet the FCC standard, and then we point out why it is that their statements, their warranties, their promises, their representations of assurances of safety violate Pennsylvania State law. The other point I would like to make, Your Honor, is that the declaration of lack of preemption. The warranty, I'm sorry. I'm sorry. Specifically, what is the warranty that you're asserting? We are asserting breach of warranty. There are breach of express warranty, breach of implied warranty. No, no, but what is the promise? What is the warranty? That they represented that these phones were absolutely safe and that they represented that these phones had absolutely no adverse health effects, and that's false. And the FCC, what is it in promulgating its regulations on RFs, what is it representing? It's difficult to put a label on what it's representing. It has set a standard that, as Judge Ambrose indicated, it is not a health and safety agency and, in fact, declined to even recognize its authority in jurisdiction. It set a standard that said we under NEPA undertake major actions when we license these broadcast facilities. I know I'm going a little off track, but I'll pull it back. We under NEPA license these major towers that emit RF energy. NEPA requires us as an agency to evaluate the environmental effects of what we do. We have to do that. The way we're going to do that is to promulgate this RF emission. And, oh, by the way, now we're going to extend it to cell phones. So while I understand and I've read what the FCC did as taking into consideration health and safety issues or environmental issues under NEPA, the fact is the FCC has also very clearly said it's not a health and safety agency, that the FDA has exclusive authority, preemptive authority. If this was the FDA and we were here right now, we wouldn't be here right now, because that is what has preemptive authority over devices. And that's what they argued before Judge LeMell in New Orleans and initially before the Fourth Circuit until they lost and now shifted their attention to the FCC. So the fact is, Your Honor, the FCC was dragged into this fight with all due respect involuntarily because it had a mandatory obligation under NEPA to assess the environmental effects of the licenses that it was issuing to these wireless providers. And that was the basis for the 1985 rulemaking where they excluded wireless completely and focused just on television, radio, and satellite broadcast facilities. And so we're doing it under NEPA, but now we have to, you know, catch up and do the cellular industry as well. I'll skip my CAFA questions because I don't need to answer them. But it almost seems to me that we've come back full circle to the very first question I asked. As I hear you speak, it almost seems that the argument you're raising is essentially that you're challenging the validity and sufficiency of the federal RF radiation standards. Not at all, Your Honor. Not at all, and nor is there any conflict with the claims that we're alleging are the remedy. The remedy, the claims that we're alleging in the remedy are purely compatible, entirely consistent, not only with what the RF standard is, which seeks not to undermine that at all, but also what the defendants are currently doing in the commercial marketplace and what the FCC itself has advocated is a way of mitigating the effects of RF emissions, and that is use headsets, and that's what we're asking for. Any other questions? Mr. Jacobson, thank you very much. Thank you. Thank you, Your Honor. The case was extremely well argued. The court would like to have a transcript prepared.